UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JUAN ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00650-SEB-TAB |
| | ) | |
| KASIE HEDDEN, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY RULING ON PRELIMINARY MOTIONS AND MOTIONS FOR SUMMARY JUDGMENT AND DIRECTING FURTHER PROCEEDINGS**

This civil rights matter is based on Juan Robinson's allegations that the defendants deprived him of insulin at Pendleton Correctional Facility (PCF) in 2019 and 2020. Both sides have moved for summary judgment. Dkts. 36, 38.

**I. Preliminary Motions**

Mr. Robinson filed his summary judgment motion on March 8, 2021. Dkt. 36. The defendants responded and filed their own motion on April 5. Dkts. 37, 38. Mr. Robinson has not responded to the defendants' motion or filed a reply in support of his own.

Mr. Robinson requested copies of the docket sheet on July 21, October 18, and December 8, 2021. Dkts. 42, 43, 44. The Court responded with a printout of the docket each time. On December 16, 2021, Mr. Robinson requested copies of the defendants' summary judgment filings and his own summary judgment motion. Dkt. 45. He did not convey that he wished to respond to the defendants' motion.

Finally, on February 14, 2022—more than ten months after the defendants moved for summary judgment, and nearly seven months after his first request for the docket sheet—

Mr. Robinson filed a motion requesting leave to respond. Dkt. 46. For the first time, Mr. Robinson stated that he did not receive the defendants' summary judgment filings. He did not deny receiving the docket sheets the Court sent in July, October, and December, and he did not explain why he could not request time to respond sooner.

In this Court, "[a] party opposing a summary judgment must, *within 28 days* . . . file and serve a response brief and any evidence." S.D. Ind. L.R. 56-1(b) (emphasis added). "A schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. p. 16(b)(4). The "primary consideration" in determining good cause "is the diligence of the party seeking" the extension. *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011).

Mr. Robinson has not demonstrated good cause for allowing a late response to the defendants' summary judgment motion. His filings do not demonstrate diligence, as the record indicates he received a docket sheet showing the defendants' summary judgment motion as early as July 2021 but waited seven months to request time to respond.

Accordingly, Mr. Robinson's motion for leave to respond to the defendants' summary judgment motion, dkt. [46], is **denied**. His motion requesting copies, dkt. [45], is **granted**. The **clerk is directed** to include copies of the docket sheet and nos. [36], [37], [38], [39], [40], and [41] with Mr. Robinson's copy of this entry.

## II. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can

also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and is not required to "scour every inch of the record" for evidence that is potentially relevant to the

summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 572–73 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

In this case, both parties have moved for summary judgment. When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

Mr. Robinson has not responded to the defendants' motion. Accordingly, facts alleged in the motion are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a motion for summary judgment, the movant 'still ha[s] to show that summary judgment [i]s proper given the undisputed facts.'" *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (quoting *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543 (7th Cir. 2011)); *see also Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021) ("Taking the facts in the light most favorable to the non-moving party does not mean that the facts must come only from the non-moving party. Sometimes the facts taken in the light most favorable to the non-moving party come from the party moving for summary judgment or from other sources.").

### III. Facts

Mr. Robinson has been insulin-dependent since being diagnosed with diabetes in 2010. Dkt. 40-4 at 6–7, 21:12–22:7. He has been incarcerated in the Indiana Department of Correction (IDOC) since June 2015. *Id.* at 2, 5:7–24. He arrived at PCF on August 9, 2019, after being transferred from Wabash Valley Correctional Facility. *Id.*

Mr. Robinson arrived at PCF with a prescription to receive insulin three times a day. Dkt. 40-1 at 4. In the morning, he was to receive Novolin and Humulin, two different types of insulin. *Id.* At noon, he was to receive Humulin only. *Id.* In the evening, he was to receive both Novolin and Humulin. *Id.* These orders remained in place at all times relevant to this action. *See id.* at 8, 13, 15, 21, 25, 30, 34–35.

Wexford of Indiana, LLC, was contracted to provide medical services to PCF inmates. Wexford employed Linda Frye as Health Services Administrator (HSA) at PCF through October 31, 2019. Dkt. 40-2 at ¶ 2. Wexford employed Kasie Hedden as Director of Nursing at PCF through September 17, 2019. Dkt. 40-3 at ¶ 3.

PCF was under lockdown from August 10 through 23, 2019. Dkt. 40-4 at 5, 14:3−11. Most of Mr. Robinson's medications were delivered to his cell during lockdown, *id.* at 7, 25:15–21, but insulin was different. A nurse would visit Mr. Robinson's cellhouse and inform the custody staff that it was time for Mr. Robinson's insulin. The custody officer would then retrieve Mr. Robinson from his cell and escort him to the nurse and back. *Id.* at 5, 14:12–21; 7, 24:13−25:14.

Despite his standing prescription for insulin, the nursing staff at PCF did not receive orders to provide Mr. Robinson insulin until August 12. Dkt. 40-1 at 54. And even then, he did not receive any insulin on August 12, 13, or 14. *Id.*

Mr. Robinson began receiving insulin on August 15—six days after his arrival to PCF—but he only received his insulin as prescribed six days in all of August. From August 15 forward, he missed the following doses:

- August 15: noon
- August 16: noon
- August 18: morning and noon
- August 19: noon
- August 20: noon
- August 22: evening
- August 23: evening
- August 27: morning and noon
- August 28: morning and noon
- August 29: morning
- August 31: morning and noon

*Id.*

Mr. Robinson began writing Ms. Frye on August 10 to alert her that he was not receiving insulin. *See* dkt. 40-4 at 4–5, 13:3–14:2. On August 16, Mr. Robinson submitted a request for interview stating that he had not received noon insulin since arriving at PCF. Dkt. 40-1 at 40. Ms. Frye responded, "your provider has your insulin ordered twice a day." *Id.* This was inaccurate: Mr. Robinson's most recent orders called for insulin three times per day. *Id.* at 13.[1] Ms. Frye did not indicate in her response, and she does not indicate in her summary judgment affidavit, that she

---

[1] Ms. Frye states in her affidavit, "Based on my review of the medical records, I advised that Plaintiffs provider had ordered that he receive his *NPH* insulin twice per day." Dkt. 40-2 at ¶ 8 (emphasis added). That is an accurate statement of Mr. Robinson's medical orders, but it is not an accurate characterization of her response to Mr. Robinson's request for interview, which simply states "your provider has your insulin ordered twice a day" and does not refer specifically to NPH insulin. Dkt. 40-1 at 40.

inquired why Mr. Robinson was not receiving his insulin as directed. *See* dkt. 40-1 at 40; dkt. 40-2 at ¶ 8.

On August 18, Mr. Robinson submitted a request for health care stating he was not receiving noon insulin and was "barely" receiving his evening insulin. Dkt. 40-1 at 39. Ms. Frye responded, "Not sure what happened but I see where your insulin has been issued since the 15th—I will look into what happened." *Id.* This response was partly accurate; as noted above, Mr. Robinson began receiving insulin on August 15, but he had only received all three doses once. Dkt. 40-1 at 4. Nothing in Mr. Robinson's medical records or in Ms. Frye's affidavit shows what steps Ms. Frye took to "look into" Mr. Robinson's inconsistent receipt of insulin. *See* dkt. 40-1; dkt. 40-2.

On September 22, Mr. Robinson submitted another request for health care stating that he still was not receiving insulin as directed and that this was affecting his blood-sugar levels and eyesight. Dkt. 40-1 at 38. Ms. Frye responded, "Nurses alert custody when they are ready each day for insulins. It's up to custody to get you over here [and] sometimes that does not happen." *Id.* at 38.

Mr. Robinson had similar problems receiving insulin in December 2019 and January 2020. Dkt. 40-4 at 8–9, 29:14–30:3.

As HSA, Ms. Frye "did not often provide direct patient care, and instead oversaw the provision of medical services at the facility." Dkt. 40-2 at ¶ 3. "This included . . . reviewing inquiries submitted by staff or offenders . . . , ensuring compliance with IDOC directives, oversight of the nursing staff, providing responses to grievances . . . , and responding to offender healthcare request forms." *Id.* Ms. Frye "did not have the authority to order any specific medical treatment or medication for any offender." *Id.* at ¶ 6. She "did, however, have the authority and responsibility to ensure that patients received access to the medical care that they required." *Id.* "In the case of

7

Mr. Robinson, this included reviewing the medical records, speaking with other healthcare providers onsite at the Pendleton Correctional facility, and ensuring that he had access to needed treatment and medication at the facility." *Id.*

As Director of Nursing, Ms. Hedden also "did not often provide direct patient care" and instead "was tasked with oversight of nursing services" at PCF. Dkt. 40-3 at ¶ 3. She "did not have the legal authority to diagnose patients or order specific medical care," but she "did have the authority to take steps to ensure that a patient was receiving appropriate nursing services, or to notify medical staff if they were unaware of offender complaints so that offenders could receive the medical care that was required." *Id.* at ¶ 4. Ms. Hedden was not physically at PCF all the time. Notably, she was away from the prison from August 7 through 23 and "had no knowledge of any potential issues [Mr. Robinson] may or may not have been having with obtaining his insulin . . . ." *Id.* at ¶ 10.

### IV. Analysis

"Prison officials violate the [Eighth Amendment's] prohibition on cruel and unusual punishment if they act with deliberate indifference to a prisoner's serious medical condition." *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "A medical condition is serious if it 'has been diagnosed by a physician as mandating treatment' or 'is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). The defendants admit for purposes of summary judgment that Mr. Robinson's diabetes, left untreated, constituted a serious medical need.

"As its name implies, deliberate indifference requires 'more than negligence and approaches intentional wrongdoing.'" *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)). "[T]he evidence must show that

8

the prison official . . . knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Id.*

No evidence would allow a jury to find Ms. Hedden deliberately indifferent to Mr. Robinson's diabetes. Accordingly, she is entitled to summary judgment. Meanwhile, a jury could resolve Mr. Robinson's claims against Ms. Frye and Wexford either way, depending on how it viewed the evidence. Accordingly, claims against Ms. Frye and Wexford will be resolved by settlement or trial.

**A.     Ms. Hedden**

Mr. Robinson is pursuing claims for damages under 42 U.S.C. § 1983. "Liability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). Thus, "Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). In other words, Mr. Robinson may prevail against Ms. Hedden only if he can demonstrate that her acts or omissions show deliberate indifference to his need for insulin—not that she merely failed to prevent deliberate indifference by her subordinate nurses.

No evidence allows that conclusion.

There is no dispute that Mr. Robinson went days without insulin and then weeks without receiving it according to his doctors' orders. The record shows that Mr. Robinson notified the medical staff of his consistent denial of insulin and that the medical staff responded and therefore knew of the situation. Those responses, however, came from Ms. Frye—not Ms. Hedden.

9

Ms. Hedden attests that she never knew Mr. Robinson was not receiving his insulin as directed. She was away from the prison for most of the relevant timeframe, and Mr. Robinson has not presented evidence to contradict her statement that she was not aware of his problem. In the light most favorable to Mr. Robinson, the record shows that Ms. Hedden failed to fulfill her duties of overseeing nursing services and ensuring that patients were receiving appropriate nursing services. *See* dkt. 40-3 at ¶ 3. But this is not the same as showing deliberate indifference, which "requires more than negligence and approaches intentional wrongdoing." *Goodloe*, 947 F.3d at 1030 (cleaned up). Ms. Hedden is entitled to summary judgment.

**B.     Ms. Frye**

To show deliberate indifference, "a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). In *Petties*, the Seventh Circuit catalogued different ways a plaintiff might meet that burden.

"If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Id.* at 729. A plaintiff can demonstrate conscious disregard for an obvious risk with evidence that the defendant's treatment decision departed so substantially from accepted professional judgment, practice or standards that it must not have been based on professional judgment. *Id.* Similarly, a plaintiff may show deliberate indifference with evidence that the defendant chose "easier and less efficacious treatment" without exercising professional judgment. *Id.* at 730 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 n.10 (1976)). "Another situation that might establish a departure from minimally competent medical judgment is where a prison official persists in a course of treatment known to be ineffective." *Id.* at 729–30.

1. **Defendants' Motion**

A jury viewing the evidence in the light most favorable to Mr. Robinson could find that Ms. Frye knew he was not receiving his insulin as prescribed, that this placed him at a serious risk of substantial harm, and that she disregarded that risk when she did nothing to correct the situation.

When Mr. Robinson arrived at PCF on August 9, his medical records clearly identified him as diabetic and clearly showed that he was scheduled to receive insulin three times every day. He began writing to Ms. Frye on August 10 when he still had not received insulin. If any evidence indicates that Nurse Frye responded to that information, it is the fact that Mr. Robinson began to receive some insulin after contacting her. But he did not receive his first dose of insulin until *five days later*. There is no evidence that this delay was based on medical judgment.

When Mr. Robinson notified Ms. Frye on April 16 that he was receiving some—but not all—of his prescribed insulin, she responded that his insulin was *ordered* to be administered twice a day. Dkt. 40-1 at 40. There is no evidence that Ms. Frye took any action to determine how much insulin Mr. Robinson was *receiving*, much less correct the situation.

When Mr. Robinson repeated his concerns on August 18, Ms. Frye responded that she would "look into what happened." Dkt. 40-1 at 39. There is no evidence that Ms. Frye followed up with any action to determine why Mr. Robinson was not receiving his insulin as prescribed, and he continued to receive his insulin only haphazardly for at least the next two weeks.

When Mr. Robinson notified Ms. Frye on September 22 that he was not receiving his insulin as prescribed and that it was adversely affecting his health, she simply responded that it was "up to custody" to ensure that he received his insulin and acknowledged that "sometimes that

does not happen." Dkt. 40-1 at 38. No evidence indicates that she took steps to determine why Mr. Robinson was often not being called to receive his insulin or what could be done to rectify the situation.

Viewed in this light, the record supports a finding that Ms. Frye "*actually* knew" beginning August 10 that Mr. Robinson was not receiving insulin as directed by his doctors—and sometimes not at all. *Petties*, 836 F.3d at 728. A jury could easily find that Mr. Robinson's medical risk—unregulated diabetes—was obvious, and no evidence in the record supports an inference that his inconsistent treatment or Ms. Frye's failure to intervene were based on medical judgment. *Id.* at 729–30. Finally, viewed as a whole, these communications show that Ms. Frye continued to rely on a course of treatment—deferring insulin administration to the custody staff without intervention—for weeks after it proved to be ineffective. *Id.* For these reasons, the Court cannot grant Ms. Frye summary judgment.

### 2. Mr. Robinson's Motion

On the other hand, a jury viewing the evidence in the light most favorable to Ms. Frye could reasonably determine that she was negligent at worst and therefore not liable for an Eighth Amendment violation.

Mr. Robinson began writing Ms. Frye on August 10, *see* dkt. 40-4 at 4–5, 13:3–14:2, but there is no evidence that she received any communication before his August 16 request for interview. Ms. Frye's response—"your provider has your insulin ordered twice a day," dkt. 40-1 at 40—could be viewed as negligent. The jury could conclude that Ms. Frye saw Mr. Robinson's complaint that he was not receiving insulin three times per day, misread his chart, and took no further action because she incorrectly believed that he was only supposed to receive insulin twice daily.

12

Mr. Robinson's lack of insulin is less clearly documented after August 31. When Mr. Robinson complained of inconsistent access to insulin on August 18, Ms. Frye responded that she would "look into what happened." Dkt. 40-1 at 39. Whether she followed through on the promise is not clear from the record. But a jury could infer that Ms. Frye looked into the problem and resolved it over the next couple weeks, given that his complaints decreased.

The record gives reason to question Ms. Frye's attention and responsiveness. Despite those questions, though, a jury could reasonably find that she was not deliberately indifferent. Therefore, the Court cannot grant Mr. Robinson summary judgment against Ms. Frye.

**C.     Wexford**

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). To prevail on a Section 1983 claim against a municipality, the plaintiff "must challenge conduct that is properly attributable to the municipality itself." *First Midwest Bank ex rel. LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021).

"[T]hree types of actions . . . can support municipal liability under § 1983: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* (internal quotations omitted). "Inaction, too, can give rise to liability in some instances if it reflects 'a conscious decision not to take action.'" *Dean*, 18 F.4th at 235 (quoting *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017)).

The plaintiff must also prove that the municipal defendant's action or inaction caused a constitutional violation. *LaPorta*, 988 F.3d at 986. "This is a high bar." *Id.* at 987. The plaintiff "must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Id.* Moreover, the plaintiff "must prove that the municipality's action was the 'moving force' behind the federal-rights violation." *Id.* (quoting *Board of County Commissioners v. Brown*, 520 U.S. 397, 404 (1997)). "[O]ne key is to distinguish between the isolated wrongdoing of one or a few rogue employees and other, more widespread practices." *Howell v. Wexford Health Sources*, 987 F.3d 647, 654 (7th Cir. 2021). Typically this requires "proof either of an express policy that is unconstitutional or a widespread practice or custom affecting other individuals or showing repeated deliberate indifference toward the plaintiff." *Id.* at 655.

Viewed in the light most favorable to Mr. Robinson, the evidence would allow a jury to find Wexford liable for an Eighth Amendment violation. Ms. Frye's testimony suggests that the practice at PCF during lockdowns was for nursing staff to ask custody staff to bring inmates to receive insulin and that there was no mechanism in place to ensure that diabetic inmates received their insulin when custody staff was not immediately responsive. A jury could reasonably determine that an obvious risk of this practice was that custody staff would not promptly respond to the nurses' requests and leave diabetic inmates without insulin for long stretches, such that Wexford's failure to account for that possibility amounted to a conscious decision not to take action. *Dean*, 18 F.4th at 235. And of course the record shows that Mr. Robinson was deprived of at least one dosage of insulin at least 16 days in a 22-day span. A jury could view this evidence as showing "repeated deliberate indifference toward" Mr. Robinson. *Howell*, 987 F.3d 655.

Viewed through the opposite lens, the evidence would allow a jury to find no Eighth Amendment liability for Wexford. A jury might reasonably find that individual failures—for example, Ms. Frye's inattention to Mr. Robinson's complaints and medical records—were the moving force behind his deprivation from insulin. *LaPorta*, 988 F.3d at 986. Similarly, a jury might view the fact that Mr. Robinson received *most* of his insulin, particularly from August 16 onward, as evidence that Wexford's practice did not create an obvious risk that diabetic inmates would not receive insulin.

Because the evidence does foreclose any verdict, the Court cannot grant summary judgment to either side on Mr. Robinson's claims against Wexford.

### V. Conclusion

Mr. Robinson's motion for leave to respond to the defendants' summary judgment motion, dkt. [46], is **denied**. His motion requesting copies, dkt. [45], is **granted**. The **clerk is directed** to include copies of the docket sheet and nos. [36], [37], [38], [39], [40], and [41] with Mr. Robinson's copy of this entry.

Mr. Robinson's motion for summary judgment, dkt. [36], is **denied**. The defendants' motion for summary judgment, dkt. [38], is **granted** as to Defendant Hedden but otherwise **denied**.

Claims against Ms. Hedden are **dismissed with prejudice**. The **clerk is directed** to terminate Ms. Hedden from the docket. No partial final judgment will enter.

Claims against Ms. Frye and Wexford will be resolved by settlement or trial. The Court will consider recruiting counsel to assist Mr. Robinson through the remainder of the action. The **clerk is directed** to include a form motion for assistance with recruiting counsel with Mr. Robinson's copy of this entry. Mr. Robinson will have **through March 25, 2022**, to either complete and return the motion or to notify the court that he wishes to proceed without counsel.

**IT IS SO ORDERED.**

Date:     2/25/2022

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JUAN ROBINSON
119967
PENDLETON – CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Rachel D. Johnson
KATZ KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com